# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| IN RE:<br>PAUL M. NEWMAN<br>    Debtor<br><br>EILEEN OLMSTEAD,<br>    Plaintiff<br><br>v.<br><br>PAUL M. NEWMAN, DVM<br>    Defendant. | Case No. 05-14139<br>Chapter 7<br>Judge George C. Paine, II<br><br><br><br>Adversary Number: 06-181A |

## MEMORANDUM OPINION

The matter before the court is before the court on the complaint filed by Eileen Olmstead ("Plaintiff") against Paul M. Newman ("Debtor") seeking to hold a debt for unpaid wages nondischargeable pursuant to 11 U.S.C. § 523(a)(6). After a full evidentiary hearing held on Friday, July 13, 2007, the court took the matter under advisement. For all the reasons contained herein, the court finds the plaintiff is unable to sustain her burden of proof, and therefore the debts referenced herein are discharged. The following constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P 7056.

The facts of this case are largely uncontested and fairly straightforward. The debtor owned a veterinary hospital where the plaintiff, Eileen Olmstead, had been a

sixteen-year employee. In February, 2001, when plaintiff came to work, she received a memorandum from debtor stating that he had sold the veterinary hospital to Dr. Makar.[1] According to the memo, all employees were terminated, but the plaintiff was immediately rehired by Dr. Makar.

The plaintiff testified that she became concerned when a few weeks after the sale, she had not been paid her vacation benefits. She contacted the debtor, and he indicated that Dr. Makar had assumed all responsibilities for paying plaintiff's vacation pay in the contract purchasing the veterinary business. When Dr. Makar refused payment of these benefits, Dr. Newman suggested to the plaintiff that she contact the California Labor Board. Plaintiff lodged a formal complaint with the Labor Board in May 2001.

The complaint with the California Labor Board named both Dr. Makar and Dr. Newman, and a pre-hearing was set for July. The plaintiff sent the debtor an e-mail informing him that she had filed the complaint and outlining that she was owed $5,782.50 in vacation pay.

At the pre-hearing, Dr. Makar and Dr. Newman revealed that they were either already engaged or getting ready to commence litigation over the sale of the business. The Benefits Board stayed further proceedings until such time as the litigation was resolved and until the plaintiff was no longer employed by Dr. Makar. No further action

---

[1] The Animal Hospital of Rancho Cucamonga sold for $230,000.00. The Debtor received $15,000.00 at closing. The purchasers financed the balance through the debtor by giving two notes in the amounts of $165,000.00 and $50,000.00; The Baseline Animal Hospital sold for $770,000.00. The debtor received $5,000 prior to sale as earnest money and $560,000.00 cash at closing. The purchasers financed the balance through the debtor by giving a note in the amount of $150,000.00;

2-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:06-ap-00181    Doc 39    Filed 08/02/07    Entered 08/02/07 14:27:13    Desc Main
Document    Page 2 of 7

occurred until 2003.

In the interim, the plaintiff continued contact with Dr. Newman through e-mail and telephone calls. In October, 2002, at plaintiff's request, Dr. Newman sent a letter to the Labor Board informing that he had no legal action pending against Dr. Makar regarding vacation pay benefits, His letter stated that:

> My attorney determined that since I was not the injured party I could not file on behalf of the employees but that they would have to pursue Dr. Makar on their own.

Also around this time, due to a permanent disability, plaintiff discontinued her employment with Dr. Makar. With both obstacles removed, the Labor Board set a final hearing on plaintiff's complaint for December 2003. By this time, Dr. Newman had moved to Tennessee.[2] He sent a letter indicating he would not be able to attend the hearing personally, but was available by cell phone.

Plaintiff sent Dr. Newman an e-mail following the hearing in which she says in relevant part:

> The commissioner (forgot his name) was very patient and polite. I was concerned that he might not accept your affidavit as if hearsay, but he did. . . . Makar's lawyer (under service trade) came and put me through the ringer as if I was the culprit. . . The lawyer kept trying to make out that you agreed to pay us even after the date on the second contract to make it look like you were trying to change the conditions to stick payment to M.
>
> . . .

The tone of the e-mail is friendly, and concludes:

> Anyway, I will keep you posted. Thanks again for your help. I would really like to nail M. for us both. I think he gypped you big time in the inventory area and ought to be glad to just get off paying me.

---

[2] On November 6, 2003, the Debtor sold his California home, and received $144,415.15 in cash at the sale which the debtor used to purchase a home in Tennessee. As part of that same transaction, the debtor opened up a line of credit on his Tennessee residence for $119,000. These transactions occurred before any decision was rendered by the Labor Board.

On December 26, 2003, plaintiff e-mailed the debtor in Tennessee to inform him of the Board's decision. She writes:

> GOOD news and BAD news.
>
> Good news: I received the Labor Board decision in the mail and am happy to have won my claim for all vacation days, those due at the time of sale and those due under Makar.
>
> The bad news: It took me a while to figure out all the legal jargon and how the commissioner came to his conclusions. Despite my stressing Makar (M) being responsible for ALL my days per contract changes, the commissioner decided each owner is responsible for the time I worked for him. . . .

Plaintiff goes on to explain that with penalties and interest, the amount Dr. Newman now owes is over $13,000.00.

Dr. Newman replied to plaintiff that same day. He wrote congratulating the plaintiff on her decision, but states that as she probably already suspects, he is not going to pay for something that he believes Makar owes. He then writes:

> The main reason I moved out of California, is because I am going broke. . . . My net worth as we speak is about negative $200,000. . . I have consulted a bankruptcy attorney here and since my disability income any my house (with not much equity anyway) and my meager $30,000 IRA are protected, anyone I owe money to will not be able to collect. There are no wages to garnish and no "offshore" accounts to raid. This whole mess, selling the practice, owing Reichel, two divorces, 9-11, and being disabled has broken me financially. . . . I want to see you get your money more than anything else Eileen. You were a good and loyal friend and employee. I tried to protect everyone in the sale. I do not find the language at all vague, he assumed all benefits, period. I feel bad that Makar's bad faith is hurting you (and the others) financially, especially you, being on a fixed income and disabled like me.

By the time the Labor Board issued the judgment in February, 2004, Dr. Newman testified that the money from the sale of his veterinary practices had been spent. Dr. Newman's uncontradicted testimony was that he lost a substantial portion of the money during 2001 "day-trading;" used $60,000 to $80,000 in the closing up of the business; paid a couple $100,000 in taxes from sale of the business, and the remainder was spent

on living expenses.

In February, 2004, Dr. Newman sent the plaintiff an e-mail stating that he was irritated that she named him as a defendant in the first place, and was angry about the "ridiculous judgment against him" that he could not and would not pay. He told the plaintiff again that he had consulted a bankruptcy attorney. From this point on, the e-mails flew back and forth between the plaintiff and debtor, and the tone of the e-mails switches from friendly to tempered hostility. These communications continued for over a year.

Pursuant to California law, the judgment was entered in the Superior Court on April 30, 2004. In July 2005, the plaintiff filed a motion with the Superior Court of California asking that her damages award against Dr. Newman be trebled for "willful" failure to pay. Dr. Newman testified that because he could not afford to do so, he did not attend the hearing. The court trebled the damages making the debt owed to plaintiff increase to $48,178.61 plus interest at 10% per year.

On October 14 2005, the debtor filed his chapter 7 bankruptcy petition. The trustee filed a no asset report on February 9, 2006. The plaintiff filed this adversary proceeding on May 15, 2006 and the matter was set for trial in December 2006. By request of the parties, the court continued the matter until the trial heard on July 13, 2007.

The plaintiff seeks to hold her trebled damages for unpaid wages nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of the of another entity. For the debt to be nondischargeable the injury

must be both "willful and malicious." ***Markowitz v. Campbell (In re Markowitz))***, 190 F.3d 455, 463 (6th Cir. 1999). An act is deemed willful "only if it was undertaken with the actual intent to cause injury. "***Id***. at 464. The requisite intent exists when the debtor "desires to cause [the] consequences of his act, or … believes that the consequences are substantially certain to result for it." Id. at 10. (Citing ***Markowitz*** at 463.). In this case, the "willful" element was established by the state court's findings in trebling the damages.

An act is defined as "malicious" for non-dischargeabiilty purposes if it is undertaken in conscious disregard of one's duties or without just cause or excuse. ***Wheeler v. Laudani***, 783 F.2d 610, 615 (6th Cir.1986). Under ***Wheeler***, "malicious acts do not "require ill will or specific intent to do harm." ***Id.*** Whether Dr. Newman's failure to pay the vacation pay to the plaintiff was malicious is the issue in this adversary proceeding.

Plaintiff tries to imply that the defendant acted maliciously in failing to pay her vacation benefits despite the large amounts of money he received from the sale or his veterinary practices.[3] The debtor defendant contends that by the time the judgment was entered against him, there were no funds to pay the debtor. In fact, he stipulated that in 2001, when plaintiff first claimed he owed the money, he had enough cash to pay the $5,900 in vacation pay several times over. However, by the time the judgment

---

[3] The court found the plaintiff's argument disingenuous at times. The plaintiff implied that Dr. Newman had maliciously not paid her claim in 2001, but the proof introduced shows Dr. Newman actually helped plaintiff by suggesting the filing of a claim with the California Labor Board on the <u>mistaken</u> belief that Dr. Makar was responsible for all of her vacation benefits. Plaintiff's argument that the debtor had plenty of funds to pay her claim from the sale of the veterinary practice, ignores the reality that Dr. Newman felt, and still feels that he did not owe the vacation benefit pay. By the time the debtor actually learned of his responsibility, whether he agreed with the Commissioner's decision or not, the debtor's own finances were in shambles. The trustee filed a no asset report in the debtor's chapter 7 case.

was rendered, there was no maliciousness in failing to pay the debtor's judgment, only a sincere belief he did not owe the money and an inability to pay such a large debt.

The court finds the plaintiff was unable to show by a preponderance of the evidence that plaintiff's conduct was malicious. The proof offered, in this court's opinion, supports just the opposite conclusion. From the numerous e-mails exchanged between the parties, and the testimony at trial, it appears that Dr. Newman earnestly believed Dr. Makar had assumed responsibility for payment of plaintiff's benefits.[4] Based on this earnest belief, that at times, seems shared by plaintiff, he tried to help the plaintiff pursue Dr. Makar. The fact that Dr. Newman's belief turned out to be incorrect does not convert his actions to malicious conduct.

The court, therefore, finds the debt owed to plaintiff is discharged. The plaintiff's adversary proceeding is dismissed with prejudice. The court instructs counsel for the debtor to prepare an order not inconsistent with this decision within five (5) days of entry of this Memorandum.

---

[4]The court found Dr. Newman to be a credible witness. His testimony only supported the documentary evidence that showed he had acted in good faith in dealing with the plaintiff. The court found the plaintiff credible as well, but the case was far short of supporting her allegations of malicious conduct.

7-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:06-ap-00181    Doc 39    Filed 08/02/07    Entered 08/02/07 14:27:13    Desc Main
Document      Page 7 of 7